IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MARIE HASTING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | NO. 3:17-cv-00989 |
| v. ) | JUDGE RICHARDSON |
| ) | |
| FIRST COMMUNITY MORTGAGE, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION**

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 39). Plaintiff has filed a Response (Doc. No. 48), and Defendant has filed a Reply (Doc. No. 58).

## **BACKGROUND**

Plaintiff Marie Hasting is a former employee of Defendant First Community Mortgage ("FCM"). In this action, she alleges that Defendant discriminated against her based upon gender (female) and national origin (Hispanic) and retaliated against her for protected activity, all in violation of Title VII (42 U.S.C. § 2000e, *et seq.*).[1]

Plaintiff began her employment with Defendant in 2014 as Director of Human Resources. At that time, Defendant's CEO was Keith Canter and its President was Philip Carlton. The Offer of Employment and Terms letter, dated October 29, 2014, and signed by both Plaintiff and Canter (as CEO of FCM), states that Plaintiff's annual salary will be $90,000, and a bonus will be paid as follows: (a) $2,500 due on the most immediate pay date after her official start date, to cover the bonus for the 4th quarter 2014; and (b) a $2,500 bonus in each quarter of 2015 (Doc. No. 42-1, Ex.

---

[1] Plaintiff's Equal Pay Act claim was dismissed by a previous Order of the Court (Doc. No. 38).

1).[2] Plaintiff contends that Canter agreed that Plaintiff's salary would be increased by 25% after one year, but that agreement is not reflected in the Offer Letter.

Plaintiff alleges that, over time, she began to feel that Canter treated her differently than other employees by (1) walking by her without saying "good morning" and (2) socializing or attending lunches with male employees and not with Plaintiff.[3] In December 2015, Plaintiff allegedly discussed this perceived differential treatment with Canter. She claims she told Canter that she felt like he was treating her differently and that it was important for her to have a good relationship with her boss. She contends that after her conversation with Canter about this "differential treatment," Canter told Plaintiff to report to Carlton for her 2015 performance evaluation. Plaintiff claims she received an overall rating for 2015 of "very good" and then began reporting directly to Carlton, who by then had assumed responsibility for Human Resources.

Plaintiff alleges that in March 2016, she met with Carlton to share concerns about Canter's behavior, and Carlton told Plaintiff about a group called the "Penis Club" ("the Club"). Plaintiff contends that the Club, named by a former female employee, was a group of male-only managers and executives who would go to lunch together, have meetings, and socialize together during work hours. Plaintiff's Complaint alleges that the Club members made company decisions without females present. Plaintiff complained to Carlton about being excluded from the Club.

Plaintiff contends that at an executive team meeting in January 2017, while Carlton was out of the room, Plaintiff answered a number of work-related questions about the status and timeline for various projects that Carlton was handling. Plaintiff alleges she answered these

---

[2] The letter also provides that the bonus structure over time can be altered and modified as Plaintiff and Canter (CEO) work together to define "the best bonus structure that creates a win/win" for Plaintiff and FCM (Doc. No. 42-1, Ex. 1).

[3] Plaintiff admits she did not ask to join these lunches (Doc. No. 49, ¶ 4).

2

questions truthfully. Plaintiff also alleges that, after the meeting, Carlton told her that she had "thrown him under the bus" in that meeting. A few days later, Carlton and Plaintiff met to do Plaintiff's 2016 performance evaluation. Although she claims she was surprised by and disagreed with some of the parts of her performance evaluation, Plaintiff did not consider that evaluation to be negative. Nonetheless, Plaintiff asserts that she realized during this meeting that she and Carlton were not going to be able to continue working together because she could not trust him anymore. The following Monday, Plaintiff resigned.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts.

*Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## TITLE VII

Title VII makes it unlawful for an employer to discriminate against any individual because of such individual's gender, race or national origin. 42 U.S.C. § 2000e-2(a)(1); *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009). A plaintiff may use either direct or circumstantial evidence to bring a discrimination claim. Direct evidence is evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. *Rock v. T.N.H.D. Partners, LLC*, 833 F. Supp. 2d 802, 815 (M.D. Tenn. 2011).

If a plaintiff relies on circumstantial evidence, she must establish a *prima facie* case of discrimination by a preponderance of the evidence. *Redlin v. Grosse Pointe Pub. Sch. Syst.*, 921 F.3d 599, 606 (6th Cir. 2019). If she establishes that *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. If it does so, the burden returns to the plaintiff to show that the defendant's reason was a pretext for discrimination. *Sybrandt v. Home Depot U.S.A., Inc.*, 560 F.3d 553, 557-58 (6th Cir. 2009); *Monce v. Marshall Cty. Bd. of Educ.*, 307 F. Supp. 3d 805, 814 (M.D. Tenn. 2018).[4] Throughout this burden-shifting approach, the plaintiff bears the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate. *Monce*, 307 F. Supp. 3d at 814.

## **GENDER AND NATIONAL ORIGIN DISCRIMINATION**

Defendant has pointed to deposition testimony of Plaintiff that strongly suggests she has no direct evidence of gender or national origin discrimination by Carlton (Doc. No. 42-1 at 25 and 32 (Dep. at 98 and 126)).[5] Defendant claims that this testimony constitutes an admission by Plaintiff that Carlton did not discriminate against her on these prohibited grounds. Identifying this testimony satisfies Defendant's burden as the movant on this issue. Plaintiff's response to this claim purports to deny that she admitted any such thing, but she fails adequately to support her

---

[4] To show pretext, Plaintiff may show that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the action, or (3) the proffered reason was insufficient to warrant the adverse action. *Sybrandt*, 560 F.3d at 558.

[5] "Do you feel that Phil Carlton ever discriminated against you because of your gender or your national origin? No." Doc. No. 42-1 at 25 (Dep. at 98). "Did Phil Carlton say anything to you that was evidence that he was discriminating against you because of your gender or your national origin? Phil? No." "Did he indicate to you when he met with you that this evaluation was in any way retaliatory against you for something you did or said? No." (Doc. No. 42-1 at 32 (Dep. at 126)).

denial; her response states simply that Carlton *knew about* the Club, not that he personally discriminated against her (Doc. No. 49 at ¶ 28).

In further response to Defendant's assertion, Plaintiff contends in her Affidavit (Doc. No. 52) that she now (after discovery) *believes* Carlton discriminated against her based on her gender (*Id.* at ¶ 14), but she does not adequately support this new "belief." Affidavits used to oppose a summary judgment motion must be made on personal knowledge. *See* Fed. R. Civ. P. 56(c)(4). Conclusory assertions are not sufficient to show a genuine issue of fact necessary for the denial of summary judgment. *Deramus v. McCoig*, No. 3:16-CV-00275, 2019 WL 1048840, at * 4 (E.D. Tenn. Mar. 5, 2019); *Miller v. Firstar Bank,* 111 F. App'x 796, 802, n. 7 (6th Cir. 2004).

Moreover, a party may not create a factual issue by merely filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony. *Reid v. Sears, Roebuck & Co.*, 790 F.2d 452, 460 (6th Cir. 1986), *cited in Evola v. City of Franklin, Tenn.*, 18 F. Supp. 3d 935, 939 (M.D. Tenn. 2014). A party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists. *Id.* The rationale behind this doctrine is simple: if a party who has been examined at length under oath could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016).

The Court will reject all portions of Plaintiff's Affidavit (Doc. No. 52) that directly contradict her prior deposition testimony and/or set forth her "beliefs" based on sheer speculation. Absent these portions, Plaintiff has not presented any direct evidence that Carlton discriminated against her because of her gender or national origin. In addition, Plaintiff apparently does not even attempt to suggest that there is direct evidence that Canter did so.

The Court next turns to the alleged circumstantial evidence of discrimination upon which Plaintiff relies. To establish a *prima facie* case based on circumstantial evidence, a plaintiff must show the Court, by a preponderance of the evidence,[6] that she (1) belonged to a protected class, (2) was qualified for the job at issue, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class or treated differently from similarly situated employees outside the protected class. *Kiwewa v. Postmaster General of the United States*, No. 17-4296, 2018 WL 6822321, at * 2 (6th Cir. Oct. 11, 2018) (citing *Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018)).

Defendant argues that Plaintiff cannot show that she suffered an "adverse employment action," which is defined under Title VII caselaw as a "materially adverse change in the terms or conditions of employment." *Towns v. Memphis/Shelby Cty. Health Dep't*, No. 17-cv-02626, 2019 WL 639050, at * 5 (W.D. Tenn. Jan. 25, 2019) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014)). An adverse employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *McMahan v. Flour Int'l*, No. 3:17-01262, 2018 WL 4491133, at * 3 (M.D. Tenn. Sept. 19, 2018).

It is not entirely clear to the Court which of Plaintiff's claimed adverse employment actions are alleged to be based upon Plaintiff's race or national origin and which are allegedly based upon retaliatory motives. Using the Complaint (Doc. No. 1) and Plaintiff's Response (Doc. No. 48) to the pending Motion, the Court concludes that it should address the following alleged adverse actions in connection with Plaintiff's claim of discrimination.

---

[6] *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *Equal Employment Opportunity Comm'n v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015); *Bruce v. Levy Premium Foodservices Ltd. P'Ship of Tenn.*, 324 F. Supp. 3d 962, 968 (M.D. Tenn. 2018).

Plaintiff contends that Canter treated her differently from other employees by walking by her without saying "good morning" and by not including her when socializing or attending lunches with male employees. Neither of these alleged actions constitutes a significant change in Plaintiff's employment status or represents a materially adverse change in the terms or conditions of her job. Defendant has shown that Plaintiff testified that this alleged different treatment never got in the way of her job performance. (Doc. No. 42-1 at 32-33 (Dep. at 128-29)). She testified that not being invited to lunch with the other managers did not impact her job performance but made her feel like she was not part of the team. (*Id*. at 46 (Dep. at 183)). The Court finds that these alleged actions, while perhaps understandably dispiriting and frustrating for Plaintiff, do not rise to the level of an "adverse employment action."

Plaintiff also asserts that Canter made comments to her about "adding color to the team" and the company's website being "very white and all men." She claims that Canter told her to "add color and more women to the staff." (Doc. No. 1 at ¶¶14-16). Plaintiff has stated that she found it offensive and discriminatory that Canter made these comments. (Doc. No. 52 at ¶ 10). Although, as Defendant points out, Plaintiff testified at her deposition that she was not harmed by these comments (Doc. No. 42-1 at 43 (Dep. at 171)), her Affidavit states that she was harmed "as an affront to my gender and culture." (Doc. No. 52 at ¶ 11). Yet, Plaintiff admitted that increasing the number of minorities in the employment population was "encouraged" and that she had no problem with it (Doc. No. 42-1 at 43 (Dep. at 169)). She just thought that Canter's comments were "inappropriate" and he should not joke about it (*Id*.). The Court will not second-guess Plaintiff's personal view as to whether these comments were offensive to her. But it will say that these comments are indicative of a desire to recruit, hire, and maintain—rather than take adverse

employment action against—racially diverse persons. In any event, these comments do not amount to an adverse employment action under Title VII.

Plaintiff submits that Canter moved Plaintiff in Defendant's reporting system so that she no longer reported to Canter, but to Carlton. Defendant has met its burden by pointing out that Plaintiff does not *allege* this move was a materially adverse change in the terms or conditions of her employment or that this move caused her harm. She does not dispute that Carlton had assumed responsibility over Human Resources as part of a reorganization, and she began reporting to him (Doc. No. 49 at ¶ 13). In other words, she began reporting to the person directly above her on the organizational chart (Carlton) and not the person (Canter) above Carlton. Such a reporting structure seems quite ordinary, and the Court suspects that some would say the switch to it would actually benefit Plaintiff in some ways (by, for example, potentially reducing the pressure on her and increasing her chances of getting "face time" with her supervisor). But, in any event, Plaintiff has not shown that this action was an adverse employment action under Title VII.

Plaintiff also contends that Canter moved Plaintiff's office upstairs in 2016 (Doc. No. 1 at ¶ 26). Defendant has shown that Plaintiff testified she was not the only employee whose office was moved at that time. She also testified that her HR staff was moved upstairs, but she did not want to move (Doc. No. 42-1 at 67-68 (Dep. at 267, 269)).[7] Defendant has met its burden here, and Plaintiff has not pointed to anything indicating that this action caused any harm to Plaintiff or otherwise was a change in the terms and conditions of her employment sufficient to be an adverse employment action, as that term is defined under Title VII.

---

[7] Plaintiff stated that she believed the move was discriminatory because Carlton told her that Canter moved her because she was a woman (*Id*. at 68 (Dep. at 270)). In her Affidavit, Plaintiff stated that she believed moving her office against her will was one of the actions Canter took to "keep her doing women's work" (whatever that means) (Doc. No. 52 at ¶ 32).

Plaintiff asserts that Defendant discriminatorily ran credit checks on her and on another Hispanic employee (Vega), whereas credit checks normally were run only on employees involved in producing loans and making sales. But as Defendant has pointed out, Plaintiff does not dispute that Vega was promoted into a position making sales. (Doc. No. 49 at ¶ 45).[8] Moreover, a credit check on another employee is not an adverse employment action as to *Plaintiff*.

Plaintiff testified that she does not know why a credit check was run on her. In its Local Rule 56.01 Statement, Defendant (citing competent evidence) asserts that it "inadvertently" requested a credit check on Plaintiff when she was hired (Doc. No. 49 at ¶ 47). In response, Plaintiff purports to dispute this, supporting her denial only by claiming she "was told" that Canter ordered her credit check. (*Id.*) This inadmissible hearsay is not competent to dispute Defendant's statement for purposes of summary judgment. Plaintiff testified that she was not harmed by that credit check (Doc. No. 42-1 at 105 (Dep. at 144)), though she later clarified her answer to say that running the credit check invaded her privacy (Doc. No. 49 at ¶ 48). The Court finds that the alleged invasion of privacy, though perhaps galling, did not make a materially adverse change in the terms and conditions of Plaintiff's employment and thus does not constitute an adverse employment action as that term is defined in Title VII.

Plaintiff also alleges that Canter exempted male members of the management team (who reported to Canter) from tracking their paid time off ("PTO") and did not exempt the female

---

[8] In her response to Defendant's Local Rule 56.01 Statement of Undisputed Material Facts (Doc. No. 49) ("Local Rule 56.01 Statement"), Plaintiff misstated the alleged fact stated by Defendant at ¶ 44 by adding "and Vega was neither [loan officer or involved with business development]" to the end of the statement. This phrase was not included in the facts alleged there by Defendant; Defendant did not ask for a response to any such alleged fact regarding Vega, and Plaintiff was remiss for making it appear that Defendant actually had done so. Plaintiff does not dispute, however, that "the Dodd-Frank Act requires FCM to perform credit checks on all employees that are involved with business development, such as loan officers." (Doc. No. 49, ¶ 44).

employees who reported to him, including Plaintiff (Doc. No. 1 at ¶ 19; Doc. No. 52 at ¶¶ 16 and 18). Plaintiff claims that exempting an employee from recording PTO increased their compensation because it gave him paid time off with no accountability. (*Id.*) She testified that she "warned" Canter that this practice was a financial liability for the organization. (Doc. No. 42-1 at 20 (Dep. at 79)). According to Plaintiff herself, after she complained to Canter about this practice in January 2016, he added a female member of FCM's management team who reported to him (Samantha Meyer) to the list of those exempt from tracking PTO.[9] (Doc. No. 42-1 at 21 (Dep. at 81)). Plaintiff claims she was not added as an exempt employee, but at this time (January 2016), Plaintiff was no longer an employee reporting to Canter. As noted above, she alleges that in November 2015, she was moved to report directly to Carlton (Doc. No. 1 at ¶ 25). Thus, whatever Canter did or did not do in this respect, it did not result in Plaintiff herself being denied relief from tracking PTO. This alleged action by Canter did not implicate Plaintiff in any was and thus does not amount to an adverse employment action against Plaintiff.

Plaintiff places much emphasis on her allegation that some of Defendant's male employees participated in the Club, a "group of male only employees who got together, had lunches and discussed business with no females allowed." (Doc. No. 49 at ¶ 39). Defendant has shown that Plaintiff admitted this group was not an actual club with attributes like memberships and meetings (Doc. No. 42-1 at 38 (Dep. at 150)). She testified that it was not actually a sanctioned club at FCM, not a club per se.[10] (*Id.*) She testified that she did not know how the group got its name or whether

---

[9] The parties cite to Hasting Deposition Exhibit 10 with regard to this issue, but the Court is unable to find this document in the record.

[10] Plaintiff argues that what made the Club "official" is that Defendant's President, Carlton, talked about it openly and even attended some of the lunches (Doc. No. 49, ¶ 41).

the "members" actually used that name. (*Id*. at 39 (Dep. at 153-55)). She stated that she was told that the Club would have meetings, but she did not know whether FCM business was ever discussed at those meetings. (*Id*. at 40 (Dep. at 157)). Plaintiff admits that she never talked with members of the Club or complained about it to Canter[11] (Doc. No. 49, ¶ 42), but she did complain to Carlton about being excluded from this group (Doc. No. 56, ¶ 7). Defendant has met its initial burden of refuting Plaintiff's claim that exclusion from the Club was an adverse employment action.

In response, Plaintiff claims she was harmed by the Club because she found it repugnant and a direct affront to her gender (Doc. No. 52, ¶ 12). Although Plaintiff has not alleged a hostile work environment claim, case law related to that theory of liability observes pertinently that Title VII "is not a general civility code for the American workplace." *Morgan v. Triumph Aerostructures, LLC*, 296 F. Supp. 3d 911, 924 (M.D. Tenn. 2017) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). In the retaliation context, the Supreme Court has stated that it is important to separate significant from trivial harms because Title VII does not set forth a general civility code for the American workplace. *Burlington*, 548 U.S. at 68, *cited in McQuail v. Tennessee Tech. Univ.*, 69 F. Supp. 3d 701, 715 (M.D. Tenn. 2014). "Petty slights, minor annoyances, and simple lack of good manners" are not within the purview of Title VII's anti-retaliation provisions. *McQuail*, 69 F. Supp. 3d at 715. The Court has determined that, however distasteful the alleged name of the Club may be, its alleged existence (and even its alleged exclusion of females) does not rise to the level of an adverse employment action. Plaintiff has not shown that the existence or practices of the Club affected the terms and conditions of her

---

[11] Canter testified that he had never heard of the Club prior to this lawsuit. (Doc. No. 42-2 at 8 (Canter Dep. at 32)).

employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *McMahan*, 2018 WL 4491133, at * 3.

Plaintiff further alleges that, in November 2015, Canter took away her bonus structure. (Doc. No. 1 at ¶ 25). Yet, she has admitted, in response to Defendant's Local Rule 56.01 Statement, that the change to the bonus structure was coupled with rolling her $10,000 bonus into her base salary (Doc. No. 49 at ¶ 60). There is no allegation or evidence that Plaintiff did not receive that $10,000. Plaintiff even told Canter that she "never really considered the 10K a true bonus just part of [her] salary." (*Id*., ¶ 62). Plaintiff simply received that money as part of her salary in lieu of a bonus. Plaintiff does not dispute that, at the same time her bonus structure was changed, Canter also gave her a five percent merit increase (*Id*., ¶ 63). The allegation concerning Plaintiff's $10,000 bonus does not reflect any adverse employment action.

In response to Defendant's meeting its burden of showing an absence of a genuine issue of material fact as to the existence of an adverse action, Plaintiff also complains that Canter made certain promises to her when she was hired that were never fulfilled. For example, she contends that Canter told her to trust him and that he would get her salary up to $125,000 (Doc. No. 56 at ¶ 1). The Offer of Employment letter, signed by both Plaintiff and Canter, says nothing about increasing Plaintiff's salary to $125,000 (Doc. No. 42-1 at Ex. 1). Plaintiff testified that the offer letter is an accurate statement of her employment terms. (*Id*. at 16 (Dep. at 64)). As these alleged "promises" are not among those stated terms, this Court will not consider them. Plaintiff has failed to show evidence to counter her own testimony suggesting there was no binding agreement to provide a $125,000 salary. Therefore, the omission of a raise to $125,000 annually was not a *change* in her terms of employment and was thus not an adverse employment action.

Finally, Plaintiff contends that in 2016, she was promoted to Vice President of Human Resources without any change in compensation (Doc. No. 1 at ¶ 27). She claims, with no citation to the record, that individuals who received promotions at FCM "always" received an increase in pay (Doc. No. 52 at ¶ 23). If that claim were in fact true, Plaintiff's promotion *could* be an adverse employment action, but Plaintiff has provided no evidence to support that claim. Tellingly, for example, Plaintiff has failed to show that she was denied a raise that other employees "always" (or even generally) would receive for this kind of promotion.[12] Under these circumstances, the Court finds that this promotion without a raise was not an adverse employment action.

For these reasons, the Court finds that the above actions do not rise to the level of a significant change in employment status, a significant change in benefits, or a material adverse change in the terms or conditions of Plaintiff's employment. Accordingly, in response to Defendant's discharging its initial burden on this issue, Plaintiff has not established the adverse employment action element of her *prima facie* discrimination case, and her gender and national origin discrimination claims will be dismissed.

## **RETALIATION**

Plaintiff also contends that Defendant retaliated against her for engaging in protected activity. It is unlawful for an employer to discriminate against an employee because she has opposed any practice made an unlawful employment practice by Title VII or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 200e-3(a). Plaintiff claims that Defendant retaliated against

---

[12] The Court notes that Canter contends that Plaintiff's job change was merely a reorganization, not a promotion. Either way, Plaintiff has not supported her claim that those promoted at FCM "always" got a raise.

her for "refusing to participate in gender discrimination and inappropriate behavior and treatment of female employees." (Doc. No. 1 at ¶ 37).

The elements of a retaliation claim are similar but distinct from those of a discrimination claim. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show, by a preponderance of the evidence, that (1) she engaged in activity protected by Title VII; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) there was a causal connection between the protected activity and the materially adverse action. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). To demonstrate the third requirement, a "materially adverse" action, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington*, 548 U.S. at 68.[13] As explained above, it is difficult to discern which actions Plaintiff claims were retaliatory, as opposed to discriminatory, but the Court will look first to whether Plaintiff can demonstrate protected activity.

Plaintiff claims that Carlton retaliated against her for "throwing him under the bus" at the executive meeting in January 2017. There is no evidence, however, that Plaintiff's answers to questions from Defendant's executive team at that meeting constituted protected activity; to the contrary, the evidence suggests that Carlton was upset that she, in his view, undermined him by speaking about *his job performance*. Plaintiff does not contend, or make any evidentiary showing,

---

[13] "We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility code for the American workplace.'" *Burlington*, 548 U.S. at 68.

15

that her answers pertained to any unlawful employment practice under Title VII. The Court finds that the alleged "throwing Carlton under the bus" was not activity protected under Title VII.[14]

The only other alleged protected activity that Plaintiff asserts in her Response to the Motion for Summary Judgment is her complaining to Carlton about the Club (Doc. No. 48 at 18-19). Supposedly, "Plaintiff was retaliated against for raising her objections to executive management regarding the sexist and discriminatory Penis Club." (*Id.* at 19). She contends that, in response to her complaints to Carlton about that Club, Defendant (actually, Canter) removed her bonuses and promoted her without compensation, which the Court assumes to mean "without an *increase* in compensation." (*Id.*) Even if these complaints were protected activity, the decision about Plaintiff's bonus structure could not have been made in retaliation for these complaints to Carlton. The Complaint reflects that the decision about Plaintiff's bonus structure was made in November 2015, (Doc. No. 1 at ¶ 25), before Plaintiff complained to Carlton and learned about the Club in March 2016 (*Id.* at ¶ 28). Not surprisingly, Plaintiff has failed to offer evidence refuting her own alleged timeline.

As for Plaintiff's promotion/change in job title, there is no dispute that it occurred about the same time as her complaints to Carlton about the Club. Complaints about what Plaintiff perceived to be gender discrimination would be protected activity. The Court turns, therefore, to whether the promotion/change in job title was a "materially adverse" employment action. As indicated above, Plaintiff has failed to show that she was denied a raise that other employees "always" (or even generally) would receive for this kind of promotion. Under these circumstances, the Court finds that this promotion without a raise was not an adverse employment action.

---

[14] Plaintiff admits that Carlton never retaliated against her for complaining about discrimination (Doc. No. 49, ¶ 29).

Put differently, Plaintiff has not demonstrated that, as required for a retaliation claim, this challenged employer action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Although the test here is objective and not focused on Plaintiff's subjective, personal attitude, it is telling that nothing about Defendants' alleged actions dissuaded *Plaintiff* from complaining (which she apparently did until she resigned), claiming discrimination/retaliation, and bringing a charge and, ultimately, this action against Defendant.

The Court finds that Plaintiff has not established a *prima facie* case of retaliation against Defendant, and that claim will also be dismissed.

## **CONCLUSION**

For these reasons, Defendant's Motion for Summary Judgment (Doc. No. 39) will be granted, and this action will be dismissed. An appropriate Order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE